UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                      Case No. 8:13-bk-07271-MGW
                                                            Chapter 11

J.C. Householder Land Trust #1,

      Debtor.

_____/

**FINDINGS OF FACT AND
CONCLUSIONS OF LAW ON CONFIRMATION**

      The Debtor seeks to confirm its proposed plan over the objection of its primary secured lender. Under its plan, the Debtor proposes to pay the secured lender's claim (approximately $1.1 million) amortized over twenty-five years at 5% interest, with a five-year balloon payment. The secured lender principally objects to confirmation because it says the cramdown interest rate is too low and that the Debtor is unable to demonstrate it will be able to make the balloon payment.

      In overruling the secured lender's objection, the Court first concludes that, since there is no efficient market for exit financing in this case, the appropriate method for determining the cramdown interest rate in this case is the formula approach enunciated by the United States Supreme Court in *Till v. SCS Credit Corp.*[1] Under the formula approach, the Court starts with the prime rate and adds a supplemental risk adjustment. Based on the testimony of the Debtor's expert, the Court concludes that a 1.75% risk adjustment is appropriate. When added to the prime rate, that yields a 5% cramdown interest rate. Next, the Court concludes that the Debtor's plan (including the balloon payment) is feasible. Finally, the Court concludes that the Debtor satisfies the remaining confirmation elements—including that the plan was proposed in good faith, that it

---

[1] 541 U.S. 465 (2005).

satisfies the best interest of the creditors test, and that the bar order in the plan is appropriate. Accordingly, the Court will overrule the creditor's objections and confirm the Debtor's proposed plan.

## Background

### The Debtor

The Debtor is a business trust established by the Householder family to own and operate a shopping center and the surrounding property. Jeffrey Householder is the trustee of the business trust. The sole beneficiary of the business trust is a partnership owned by Mr. Householder and his wife (70%) and their kids (30%). The trust and partnership were formed in 1986 and have jointly owned and operated the Debtor's real estate business since that time.

### The Property

The Debtor's real estate business consists of a 7.13-acre parcel of land in Plant City, Florida, that has been improved by a 40,420 square-foot multi-tenant, retail shopping center; a small commercial office/storage building; and a rental house. The shopping center is sited on 3.75 acres of land, while the rental house—a 572 square-foot, 2-bedroom/1-bathroom home—is sited on 0.27 acres. There is 3.11 acres of excess land. All of the buildings have been adequately maintained; no significant deferred maintenance is required. The buildings' appearance is average relative to the competing buildings within the market. The shopping center is similar in quality to other buildings in the area.

For the first sixteen years, the shopping center was operated as a Foodland Grocery Store. By 2002, however, the demographics of the Plant City area had changed, with migrant workers making up 50% of the local population and blue-collar workers making up the other 50%. At that point, the Debtor attempted to sell the grocery business and lease the premises to a new operator. But the Debtor realized it needed to update the shopping center and equipment. So the Debtor

made a substantial investment into the property. By the end of 2006, the property had been updated.

From 2006 to 2011, the shopping center was successfully operated by other owners of the grocery store. The recession hit the area pretty hard by 2011, however, with various local plant closings. In December 2011, the Householders took the property back, only to later sell the grocery business and re-lease the grocery store space in the shopping center to new operators who had successfully run a grocery store in New York. The new operators have continued to operate the grocery business successfully to this day under a five-year lease (with several options to extend).

SPCP's Claim

When the Debtor purchased the property in 1986, it obtained financing from Bank of America. That loan was amortized over twenty-five years, with a ten-year balloon. The loan was renewed in 1996. At the time it was renewed, the loan had a floating interest rate that rose as high as 7%, although it was generally much lower. In 2002, AmSouth Bank approached the Debtor about refinancing the Debtor's loan with Bank of America. AmSouth offered a floating interest rate of LIBOR plus 2% points, which was less than 5% at the time. The interest rate on the Debtor's loan later became fixed at 5.5% in 2005. When the loan came due in 2011, the parties agreed to extend it for one more year.

On June 20, 2012, however, the Debtor received a letter from SPCP Group V, LLC calling the loan due. SPCP is an investment company that is in the business of, among other things, buying matured, performing loans. It appears that AmSouth, like many banks during that period, sold matured loans—like the Debtor's loan—to investors like SPCP rather than renewing them, even loans that had always performed successfully. According to Mr. Householder, he was

3

completely blindsided when SPCP called the loan due. So he asked for—and obtained—an extension through December 7, 2012.

Mr. Householder did not envision any problem with refinancing the loan because of its loan-to-value ratio (it was 50%) and the Debtor's track record of payment. In fact, there had never been any monetary default, other than the inability to pay the loan on maturity. In other words, the Debtor's financial problems with respect to this property relate to a maturity default—not a payment default. Unfortunately, the Householders' credit score became a problem because of other bad real estate investments they had made, and as a consequence, the Debtor was unable to refinance the SPCP loan by the December 7 deadline.

With the Debtor unable to refinance the loan, SPCP sued to foreclose its interest in the property. At the time SPCP sued to foreclose its mortgage, it claimed it was owed approximately $1.1 million. The Debtor's property apparently was worth approximately $2 million. Given the significant equity in the property, the Debtor filed this bankruptcy case to preserve the value of its assets.[2]

## Plan of Reorganization

The same day the Debtor filed this case, it filed its proposed Chapter 11 plan.[3] The Debtor's proposed plan divided creditors into five classes:

a.  Class 1 consists of the allowed priority claims. Under the plan, these claims will be paid in full on confirmation. Class 1 is unimpaired.

b.  Class 2 consists of the Hillsborough County Tax Collector's allowed secured claims. Although the plan specifies that Class 2 is impaired, it appears that taxes are—and will remain—current under the plan.

---

[2] Doc. Nos. 1 & 9.

[3] Doc. No. 13.

4

    c.       Class 3 consists of SPCP's allowed secured claim. Under the Debtor's plan, SPCP will be paid in full, with payments amortized over twenty-five years at an interest rate of 5% and a balloon due on the 60th month after the plan's effective date.[4] The plan also enjoins SPCP from pursuing any claim against non-debtor guarantors so long as the Debtor is current on its plan payments. SPCP is impaired and has voted against the plan.

    d.       Class 4 consists of BB&T's secured claim. BB&T will be paid in full, plus 5% interest. BB&T will be paid over sixty months in equal monthly payments. BB&T is impaired and has voted in favor of the plan.

    e.       Class 5 consists of the allowed unsecured claims. There are two creditors voting in this class: Thomas Murtha (the Debtor's CPA), who holds a $3,200 claim; and TECO, which holds a $30,000 claim. The unsecured creditors are impaired. Murtha voted in favor of the plan.[5] So did TECO.[6]

SPCP objected to the Debtor's proposed plan for four reasons: First, SPCP says the Debtor's

plan is not feasible. Second, SPCP says the Debtor failed to propose its plan in good faith

---

[4] Doc. No. 70.

[5] After Murtha cast his ballot, SPCP bought his claim and attempted to change his vote. In fact, SPCP, as part of its strategy to take control of the votes in this case, apparently approached all of the creditors in this case with offers to buy their claims so that it could control all of the classes. SPCP, however, was only able to convince Murtha to sell his claim, and in any event, based on the reasoning set forth in *In re Kellogg Square Partnership*, 160 B.R. 332 (Bankr. D. Minn. 1993), as well as other cases cited by the Debtor in its memorandum of law (Doc. No. 85), the Court denied SPCP's motion to change Murtha's vote. Of course, it would not have made a difference even if SPCP could have gained control of the class of unsecured creditors and voted against the plan for two reasons. First, BB&T voted in favor of the plan, and BB&T (the sole creditor in Class 4) is impaired. So BB&T's vote in favor of the plan alone—regardless of the vote of the unsecured creditor class—satisfies § 1129(a)(10)'s requirement that at least one impaired class accept the plan. Second, even if the class of unsecured creditors voted against the plan, they could still be crammed down because they are being paid in full (subject to a minor amendment to pay interest on their claims). The Debtor's cash flow reflects this could easily be done. As a result, the vote of the unsecured creditors is unnecessary.

[6] The Debtor concedes that TECO's ballot was late. So the Debtor filed a motion to allow the late ballot. The Court granted that motion for the reasons stated in open court at the outset of the confirmation hearing. After the Court allowed TECO's late-filed ballot, SPCP argued that TECO's claim is actually a debt of one of the Debtor's tenants—not the Debtor. The Debtor, however, listed the TECO claim as undisputed in its schedules. More importantly, Mr. Householder testified at confirmation that the debt is owed by the Debtor since it is ultimately responsible for electric bills on the property, notwithstanding that the electric bill presumably would be a pass-through expense under the triple-net lease that the Debtor has with its tenants.

because it allegedly fails to pay SPCP the present value of its claim. Third, SPCP says the Debtor's proposed plan violates the best interests of the creditors test. Fourth, SPCP says the Court does not have jurisdiction to bar claims against non-debtor guarantors.[7]

## Conclusions of Law[8]

### Debtor's burden of proof is the preponderance of the evidence.

Before addressing each of those objections, it is important to first consider the Debtor's burden of proof on confirmation. SPCP contends that the Debtor must prove the confirmation elements by clear and convincing evidence. The Debtor argues that its burden is the preponderance of the evidence standard. Indeed, it appears there is a split of authority regarding whether a debtor must prove each of the elements of confirmation by a preponderance of the evidence or clear and convincing evidence. The overwhelming majority of courts have held that a debtor need only satisfy the preponderance of the evidence standard.[9] Nevertheless, a number of courts have held that a debtor must prove the confirmation elements by clear and convincing evidence.[10] The Fifth Circuit Court of Appeals addressed the issue of the appropriate burden of proof on confirmation twenty years ago in its well-reasoned decision in *In re Briscoe Enterprises*.[11]

---

[7] Doc. No. 67.

[8] The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and (O). The Debtor is eligible to be a Chapter 11 debtor under 11 U.S.C. §§ 109 and 101(9)(A)(v).

[9] Hon. Barry Russell, *Bankruptcy Evidence Manual*, at § 301:76 (citing voluminous cases).

[10] *See, e.g., In re New Midland Plaza Assocs.*, 247 B.R. 877, 883 (Bankr. S.D. Fla. 2000); *In re Miami Ctr. Assocs. Ltd.*, 144 B.R. 937, 940 (Bankr. S.D. Fla. 1992).

[11] *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. (In re Briscoe Enters.)*, 994 F.2d 1160, 1164-65 (5th Cir. 1993).

There, the Fifth Circuit, after noting a split of authority regarding the burden of proof on confirmation, observed that none of the cases applying the clear and convincing standard—rather than preponderance of the evidence standard—offered any justification for subjecting debtors to a higher burden of proof.[12] The court then looked to a variety of United States Supreme Court decisions discussing the relevant burden of proof in different contexts.[13] The Fifth Circuit noted that the United States Supreme Court had explained, in *Addington v. Texas*, that it used the "clear and convincing standard 'to protect particularly important individual interests,'" such as naturalization or deportation.[14] Importantly, the United States Supreme Court, as the Fifth Circuit points out, rejected the "clear and convincing evidence" burden of proof in dischargeability proceedings in *Grogan v. Garner*.[15]

The Supreme Court's decision in *Grogan* was based in large part on the fact that the language of Bankruptcy Code § 523 (as well as its legislative history) was silent as to burden of proof in dischargeability actions.[16] According to the Supreme Court, that silence was "inconsistent with the view that Congress intended to require a special, heightened standard of proof." Because the language of § 1129, as well as its legislative history, is likewise silent as to the burden of proof, the Fifth Circuit held that Congress could not have intended for the "clear and convincing evidence" standard to apply on confirmation.[17]

---

[12] *Id.* at 1164.

[13] *Id.*

[14] *Id.* (citing *Addington v. Texas*, 441 U.S. 418, 423 (1979)).

[15] *Id.* at 1165 (citing *Grogan v. Garner*, 498 U.S. 279, 286 (1991)).

[16] *Id.* (quoting *Grogan*, 498 U.S. at 296).

[17] *Id.*

This Court agrees with the Fifth Circuit's conclusion that debtors must prove the confirmation elements by a preponderance of the evidence. As the Fifth Circuit pointed out, confirmation does not involve any important personal interests, much less the types of personal interests involved in cases where the Supreme Court held the "clear and convincing evidence" standard applied. More importantly, there is no statutory basis for applying that heightened standard. Accordingly, the Court will now address each of SPCP's objections, in turn.

<u>It is feasible that the Debtor can make its current plan payments</u>.

Under Bankruptcy Code § 1129, the Debtor must demonstrate that confirmation of its plan is not likely to be followed by the Debtor's liquidation or the need for any further financial reorganization.[18] That determination must, as SPCP points out, be "firmly rooted in predictions based on objective fact[s]."[19] And those objective facts must show that it is more likely than not that a debtor will be able to make all payments required by the confirmed plan.[20] The Debtor meets that standard here.

The facts presented at confirmation demonstrate that the current tenant mix at the shopping center is stable and provides enough income at 85% occupancy to fully fund the plan. And the property is currently leased at 88%. The Debtor's cash flow from renting the property allows the Debtor to service the SPCP debt and accumulate enough cash to fund necessary property maintenance, pay the insurance, and pay the property taxes, as well as accumulate additional cash to cover any unforeseen contingencies or shortfalls. SPCP tried to dispute this last point by arguing that the cash flow projections differ from the monthly operating reports. To

---

[18] 11 U.S.C. § 1129(a)(11).

[19] Doc. No. 67 at 7 (citing *In re Invest. Co. of the Sw., Inc.*, 341 B.R. 298, 311 (B.A.P. 10th Cir. 2006)).

[20] *Id.*

the contrary, a review of the monthly operating reports for June and July 2013 reflect that the numbers in the cash flow projections correspond with those in the monthly operating reports, which are the most recent financial figures available and the most reasonable ones to base future projections on. The Debtor's future projections demonstrate that the shopping center generates enough revenue to allow the Debtor to make its plan payments.

In addition to the revenue generated from the shopping center, the Debtor has other sources of revenue. For instance, the residential property located on the property is available for rent. Likewise, the laundromat the Debtor is currently operating is also available for rent. The Debtor has ongoing discussions with a bond company for the other property, and based on his years of experience in renting this property, Mr. Householder reasonably believes that by January 2014 this property can be leased for a $2000 per month, which is inclusive of the $2000 incentive to be paid for six months to cover any broker's commission and tenant improvements. After six months, this $2000 will be added on to the Debtor's cash flow. So the residential property and laundromat provide additional revenue that allows the Debtor to not only make its plan payments but also accumulate additional cash.

While it is true, as SPCP argues, that the Debtor has not set aside specific escrow accounts to fund taxes, insurance, and maintenance, there is nothing that requires the Debtor to do so. The Debtor need only show that it has sufficient cash flow—based on its projections—to cover these expenses. And the Debtor's cash flow projections show ample accumulation of cash to cover these expenses. Importantly, the Debtor is current on its payments to SPCP at a monthly payment amount calculated at the full amortization amount set forth in the loan documents. Plus, all real estate taxes and property insurance have been paid in full. Given the Debtor's track record of payments, the current tenants operating the shopping center, and the property's loan-to-

9

value ratio, the Court concludes the objective facts demonstrate that the Debtor will be able to make its plan payments. Accordingly, the Court concludes the plan is feasible in terms of the Debtor's ability to make its current plan payments to SPCP and the other creditors and, as discussed below, its ability to refinance the balloon payment in five years.

<u>It is feasible the Debtor will be able to refinance the SPCP loan in five years</u>.

SPCP's better—even if ultimately unpersuasive—argument on feasibility is its claim that the Debtor will not be able to refinance its loan in five years. Under its plan, the Debtor is required to pay off SPCP's loan at the end of five years. But according to SPCP, the Debtor has failed to prove it has the financing in place to do that. The Court, however, concludes that the Debtor will be able to refinance the SPCP loan for two reasons.

First, the Debtor has a reasonable "game plan" for refinancing the balloon payment. The Debtor's game plan is for its principals (the Householders) to work through their ongoing real estate problems and improve their credit scores so that they can ultimately refinance the SPCP loan. Under the plan, they have five years to do that. Mr. Householder testified he thought the Householders could work through all of their other problems in two years, which would give them three years to find financing for the SPCP loan. Mr. Householder testified credibly that significant progress was already being made—whether in terms of mortgage mediations or short sales—toward resolving the problems with the Householders' real estate investments. In addition, the Householders' daughter just earned her Master's Degree, and it is reasonable to assume she will be able to obtain a credit score that would support the Debtor's refinancing efforts once her work situation stabilizes. Based on Mr. Householder's testimony, the Court concludes that the Householders will be able to resolve their ongoing real estate problems and improve their credit scores.

Second, there is substantial equity in the property. In particular, SPCP is owed $1,060,000. The property (including the strip shopping center, the excess land, and the residential home) is worth approximately $2 million. So the loan-to-value ratio is approximately 50%, which is excellent by any standard. Even considering the grocery store alone, the loan-to-value ratio (using a discounted cash flow methodology to determine value) is still better than 70%. Given the excellent loan-to-value ratio, the Court concludes it will be feasible for the Debtors to refinance the SPCP loan once they straighten out the problems with their real estate investments and improve their credit scores.

Incidentally, the Court notes SPCP's argument (i.e., the Debtor will not be able to refinance the balloon payment when it comes due) is the same one it made in a previous chapter 11 case before this Court: *In re Cypress Creek*.[21] In that case, there was no efficient market for exit financing in place at the time the case was confirmed.[22] But this Court took into consideration the time before the balloon payment was due (six years in that case) and noted that, while an efficient market did not exist at confirmation, markets do change over time.[23] The Court concluded in *Cypress Creek* that the fact that markets do turn around, coupled with the debtor's recent track record of payment, demonstrated that it was feasible the debtor would be able to refinance SPCP's loan.[24] The district court affirmed this Court's feasibility determination on appeal.[25]

---

[21] *In re Cypress Creek Assisted Living Residence, Inc.*, Case No. 8:08-bk-19481-MGW.

[22] *SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc.*, 434 B.R. 650, 656 (M.D. Fla. 2010).

[23] *Id.*

[24] *Id.*

[25] *Id.*

The facts of this case are nearly identical to *Cypress Creek*. Like in *Cypress Creek*, the Debtor has a track record of making its loan payments. As this Court has pointed out several times, this case is a maturity-default—not a payment-default—case. Moreover, the Debtor's projections reflect it will be able to continue making its payments to SPCP under the plan. And it was the opinion of Mr. Katsadouros (the Debtor's expert) that the Debtor will be able to get refinancing if the Debtor hits its projections, the land value holds, and the Householders improve their credit rating.

This Court finds that the Debtor's projections are reasonable given (1) the Debtor's current performance numbers; (2) the fact the Debtor has a long-term tenant that has been operating the grocery store successfully; and (3) the Debtor appears on the verge of obtaining other tenants for the shopping center property. As for land values in this area, the Court finds— based upon literally hundreds of land valuations it is called on to make or approve—land values have taken a turn for the better and that there have been substantial increases in land values throughout the area. As for the Householders' credit rating, the Court concludes, as set forth above, that the Householders have a plan for improving their credit rating; and they have five years to do it.[26]

The only evidence offered that obtaining financing in five years is not feasible was the testimony of SPCP's expert (David Repka). But the best that Mr. Repka could come up with is that it is "hard to speculate" what will happen in five years. By contrast, the Debtor's expert testified credibly that the Debtor could get refinancing if the Debtor hits its projections, the land

---

[26] There were also repeated questions about the Householders' potential tax liability for forgiveness of any deficiencies they have incurred. While the Court is well aware that cancellation of debt is something that can be taxed, there is no evidence in this case that the Householders will actually incur this sort of "phantom income" in the future. In fact, the only evidence relating to this possibility was Mr. Householder's testimony that he has $890,000 of net operating losses to set off against any cancellation-of-debt income.

value holds, and the Debtor's principals improve their credit rating. And the Court has already concluded that those projections are reasonable, the land values will hold, and the Householders will improve their credit rating. Accordingly, the Court concludes it is feasible that the Debtor will be able to refinance SPCP's loan.

<u>The Debtor proposed its plan in good faith</u>.

Under § 1129(a)(3), the Debtor must prove the plan was proposed in good faith. The term "good faith," however, is not defined anywhere in the Bankruptcy Code.[27] As a consequence, bankruptcy courts determine the existence of good faith in light of the totality of the circumstances.[28] In reviewing the totality of the circumstances to determine good faith, courts generally focus on the terms of the plan and the ability of the plan to achieve the objectives of the Bankruptcy Code.[29] Here, there really is no question that the plan proposed achieves the Bankruptcy Code's objectives. Instead, SPCP argues that the plan has not been proposed in good faith because SPCP is not going to be paid in full, while other creditors are being paid in full over the term of the plan.

SPCP's good-faith objection fails for two reasons. First, SPCP will, in fact, be paid in full over the term of the plan—albeit with a balloon payment. Balloon payments are typical in real estate financings, as evidenced by the testimony by both parties' expert witnesses of the type of financing that is available in the marketplace. In fact, the majority of the examples given by the experts on both sides involved balloon payments. Since the Court has found it is feasible to pay off the loan in five years, then SPCP will be paid in full. Second, there is nothing in the good-

---

[27] *In re Proud Mary Marina Corp.*, 338 B.R. 114, 122-23 (Bankr. M.D. Fla. 2006).

[28] *Id.* (citing *In re Bravo Enters.*, 331 B.R. 459, 472 (Bankr. M.D. Fla. 2005)).

[29] *Id.*

faith requirement that requires everyone to be treated the same. That is a classification issue, and there has been no objection to improper classification of claims. All that is required is that all of the claims in a particular class receive the same treatment. And that is what the Debtor's plan provides for here. The real focus in bad-faith cases is on whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions.

Looking at the traditional evidence bankruptcy courts consider in making good-faith determinations, the Court finds that they all weigh in favor of a finding of good faith here. For instance, this case was caused entirely by circumstances brought about by the so-called "Great Recession." Moreover, this is not even a payment-default case; it is a maturity-default case. Financial circumstances beyond the Debtor's control prevented the Debtor and its principals from renewing or refinancing the SPCP loan. Neither the Debtor nor its principals have any track record of prior bankruptcy filings, which is typical in bad-faith cases. There were no prolonged foreclosure proceedings in state court. Nor is there any evidence the Debtor filed this case for purposes of delay. In fact, this case was prosecuted in record time. It is very rare to have a plan filed with a petition and then ready for confirmation as quickly as the Debtor did in this case. In most cases, debtors buy as much time as possible to try to confirm a plan. Here, the Debtor prosecuted this case very quickly and, but for the objections by SPCP, would have been out of Chapter 11 some time ago.

The appropriate cramdown interest rate is 5%.

In order for a Chapter 11 plan to be confirmed, the proponent of the plan—typically the debtor—has the burden of establishing the requirements enumerated in § 1129(a)(1)-(16). One of those subsections—§ 1129(a)(8)—requires that each impaired class has accepted the plan.[30]

---

[30] 11 U.S.C. § 1129(a)(8).

Here, one of the impaired classes of creditors—Class 3 (consisting of SPCP's secured claim)—did not accept the plan. Because it failed to satisfy § 1129(a)(8), the Debtor must look to § 1129(b) to confirm its plan.

Under § 1129(b), the Court can confirm a plan over the objection of an impaired creditor (assuming all of the other requirements of confirmation of § 1129(a) are met) if it is "fair and equitable."[31] This procedure is commonly referred to as "cramdown" because the Court is imposing a plan treatment on an impaired class of creditors—involuntarily—over their objection. Section 1129(b) goes on to provide when a plan is "fair and equitable" with respect to different classes of creditors. With respect to a secured claim, a debtor can satisfy the "fair and equitable" requirement by providing the creditor—in this case, SPCP—with deferred payments of a "value" at least equal to the "allowed amount" of the secured claim as of the effective date of the plan.[32] In other words, the deferred payments, discounted to present value by applying an appropriate interest rate, must equal the allowed amount of the secured creditor's claim.

The critical issue in this analysis is the appropriate interest rate. The leading case discussing the interest rate for cramming down a creditor is the United States Supreme Court's 2004 decision in *Till v. SCS Credit Corp.*[33] In *Till*, a secured creditor objected to the cramdown interest rate in the debtor's proposed chapter 13 plan. Section 1325, like § 1129, allows a chapter 13 debtor to cramdown a secured creditor. As in Chapter 11 cramdown under § 1129, § 1325 requires bankruptcy courts to ensure that the property to be distributed to a particular secured creditor over the life of a bankruptcy plan has a total "value, as of the effective date of the plan,"

---

[31] 11 U.S.C. § 1129(b)(1).

[32] 11 U.S.C. § 1129(b)(1)(A)(i)(II) ("[E]ach holder of a [secured claim must] receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.").

[33] 541 U.S. 465 (2005).

that equals or exceeds the value of the creditor's allowed secured claim.[34] This requires a payment of interest over the repayment period. The issue is—what is the appropriate interest rate? The Supreme Court in *Till* considered four possibilities for the cramdown interest rate: the coerced loan, the presumptive contract rate, the cost of funds, and the formula approach.[35]

The Court ultimately settled on the formula approach. According to the Supreme Court, the other three approaches should be rejected because they are complicated, impose significant evidentiary costs, and aim to make creditors whole rather than ensure that creditors are paid the present value of their claims. The formula approach, however, does not suffer from any of those defects. Under the formula approach, the bankruptcy court starts with the national prime rate.[36]

The prime rate, of course, reflects the financial market's estimate of what a commercial bank should charge a commercial borrower who is creditworthy. So that takes into account, as the Court recognized, the bank's opportunity costs and the relatively slight risk of default.[37] But what about the greater risk of default posed by a debtor in bankruptcy? To account for a debtor's increased likelihood of default, bankruptcy courts employing the formula approach add a supplemental risk adjustment.[38]

The supplemental risk adjustment is intended to account for factors such as the circumstances of the bankruptcy estate, the nature of the creditor's collateral, and the duration and feasibility of the plan.[39] Unfortunately, the Court did not provide any specific guidance

---

[34] *Id.* at 474 (citing 11 U.S.C. § 1325(a)(5)(B)(ii)).

[35] *Id.* at 477-78.

[36] *Id.* at 478-79.

[37] *Id.* at 479.

[38] *Id.*

[39] *Id.*

regarding the amount of the supplemental risk adjustment. That issue was not before the Court. The bankruptcy court in that case had approved a 1.5% risk adjustment, which the Court affirmed.[40] And the Supreme Court observed that bankruptcy courts generally approve risk adjustments ranging from 1% to 3%.[41]

Admittedly, *Till* was a chapter 13 case. That is relevant because the Supreme Court, in a footnote, observed that there is no readily apparent Chapter 13 cramdown market interest rate.[42] By contrast, the Court observed, the same is generally not true in Chapter 11 cases. The Court noted that numerous lenders advertise financing for Chapter 11 debtors.[43] Because of the availability of financing in chapter 11 cases, the Court suggested it might make sense for bankruptcy courts to ask whether an efficient market exists for exit financing in a Chapter 11 case.[44]

Nevertheless, as the Fifth Circuit recently recognized in *Texas Grand Prairie*, the vast majority of bankruptcy courts have taken the *Till* plurality's invitation to apply the "prime-plus" formula to Chapter 11 cases.[45] In doing so, those bankruptcy courts first recognize they only should apply the "prime-plus" formula where an efficient market does not exist, only to find— almost invariably—the absence of such a market.[46] Those courts have generally applied a risk adjustment ranging from 1%-3%, depending on the quality of the debtor's management, the

---

[40] *Id.* at 480.

[41] *Id.*

[42] *Id.* at 477 n.14.

[43] *Id.*

[44] *Id.*

[45] *Wells Fargo Bank, N.A. v. Texas Grand Prairie Hotel Realty, LLC (In re Texas Grand Prairie Hotel Realty, LLC)*, 710 F.2d 324, 333 (5th Cir. 2013).

[46] *Id.*

commitment of the debtor's owners, the health and future prospects of the debtor's business, the quality of the lender's collateral, and the feasibility and duration of the plan.[47] So the threshold issue for determining the appropriate cramdown interest rate is whether an efficient market exists.

This issue came up in the *Cypress Creek* case discussed earlier. There, the debtor's major secured creditor appealed this Court's determination—in considering the appropriate cramdown interest rate—that an efficient market did not exist.[48] On appeal, the district court considered whether this Court erred in relying on the debtor's expert witness to determine that an efficient market did not exist. In considering the issues on appeal, the district court in *Cypress Creek* considered this Court's application of the *Daubert*[49] standard (as adopted in Federal Rule of Evidence 702) at confirmation.

The threshold requirement for the admissibility of the opinion testimony under Rule 702—once it is established that a witness is qualified as an expert by knowledge, skill, experience, training, or education and can testify in the form of an opinion and that the expert's specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue—is threefold: First, the testimony must be based on sufficient facts or data. Second, the testimony must be the product of reliable principles and methods. Third, the expert must have

---

[47] *Id.* at 333-34.

[48] *SPCP Group, LLC v. Cypress Creek Assisted Living Residence, Inc.*, 434 B.R. 650, 656 (M.D. Fla. 2010). Coincidentally, the creditor in that case was SPCP Group, LLC, which is presumably affiliate with the secured creditor here: SPCP Group V, LLC. Both entities were (or are) ably represented by the same attorney: Greg McCloskey.

[49] *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).

reliably applied the principles and methods to the facts of the case.[50] It is the first requirement that is the most important.

The simple *ipse dixit* of the expert is not enough.[51] The expert must be able to point to hard evidence—in the form of facts or data—that supports the opinion. To take an easy example, an appraiser offering opinion testimony about the value of real property must testify to the comparables used by the appraiser. Without the comparables, the valuation opinion is worthless. In *Cypress Creek*, Judge Lazzara—in affirming this Court's determination that an efficient market did not exist—observed that the testimony of the creditor's expert was lacking with respect to particular examples of loans that were available for entities like the debtor in that case. Because the creditor's expert in *Cypress Creek* failed to give any examples of loans that were available to entities like the debtor in that case, the district court concluded that this Court did not abuse its discretion in crediting testimony by the debtor's expert over testimony by the creditor's expert.

This case is like *Cypress Creek*. Here, SPCP called David Repka as its expert.[52] Mr. Repka majored in psychology in college and had no post-graduate education. His credentials included being a licensed real estate broker and holding a mortgage broker's license. In addition, he had previously been retained in five bankruptcy cases to provide opinion testimony. He has

---

[50] Fed. R. Evid. 702.

[51] The phrase *ipse dixit* means "something said but not proved." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 482 (3d ed. 2011). The Supreme Court, in *Kumho Tire Co., Ltd. v. Carmichael*, recognized that "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." 526 U.S. 137, 157 (1999) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

[52] After Mr. Repka was tendered as an expert, the Debtor objected to his qualifications. The Court overruled the objection, in part, finding that Mr. Repka had sufficient training and experience as a mortgage broker to opine on interest rates. The Court, however, did not find that he had the expert qualifications to opine on feasibility of the Debtor's plan or anything beyond interest rates. As a consequence, the Court will only consider that portion of his testimony.

never worked for any bank or lending institution and has never provided exit financing to a Chapter 11 debtor.

Mr. Repka opined that exit financing in this case would require an interest rate of 10-15%, plus origination fees to the lender and mortgage broker. He opined that this type of lending was available in the marketplace. He based this opinion not on his own personal experience in obtaining exit financing, but rather on phone calls he made to a number of lenders who told him they would make loans to a debtor emerging from bankruptcy where the default was a maturity default (rather than a payment default). The lenders Mr. Repka talked to apparently gave him interest rates ranging from 4.5% to 16% for loans to entities like the Debtor in this case (i.e., a company emerging from bankruptcy where the default was a maturity default).

But Mr. Repka's opinion did not meet the *Daubert* and Rule 702 standard. The only facts or data relied on by Mr. Repka were phone calls to people in the business of lending money, who, in turn, gave Mr. Repka their opinions as to what the pricing for such a loan would be. In other words, SPCP would have this Court accept the *ipse dixit* opinions in these third-party hearsay statements as a sufficient basis for Mr. Repka to opine as to the appropriate cramdown interest rate. The key point here is that the facts or data that are necessary to support an expert opinion are hard numbers of actual loans being made—not conjecture or opinions or promises about what is available in the marketplace.

What the Court is looking for is a list of lenders actually providing chapter 11 exit financing for debtors similar to the one in this case. And there was not one scintilla of evidence introduced by SPCP of anyone actually providing exit financing lending using real-life examples. Mr. Repka certainly has had no experience with real-life exit financing, even though

he has been retained in bankruptcy cases before. Accordingly, his testimony fails the most basic application of the *Daubert* standard as codified in Rule 702.

By contrast, the Debtor offered the expert testimony of Mr. Gus Katsadouros. Mr. Katsadouros heads up the Real Estate Capital Markets Department of Glass Ratner, a well-known national firm that deals with insolvency cases and debtor-in-possession and post-petition exit financing for Chapter 11 debtors. Mr. Katsadouros has an MBA degree and over two decades of experience in real estate lending for national banks. His work experience specifically includes interest-rate setting for loans originated by his department. The Court found him to be a very credible and competent expert on commercial lending and setting interest rates.

Mr. Katsadouros testified credibly as to the availability of loans in the marketplace for the Debtor and what a reasonable interest rate would be in this case. With respect to the availability of loans, Mr. Katsadouros made a distinction between traditional and non-traditional lenders. Traditional lenders are banks and life insurance companies. Non-traditional lenders are private companies willing to take more risk for higher return. Non-traditional lenders often take a piece of the equity and do not look at the same underwriting standards that traditional lenders do.

In Mr. Katsadouros' view, the Debtor would be unable to obtain an institutional quality loan made by a traditional lender. For starters, the loan in this case is too small given the costs involved. Besides that, the Debtor's tenants are not "credit" tenants. "Credit" tenants are anchor tenants like national grocery or retail chains—such as Publix or Wal-Mart. Here, the tenants are "mom and pop" grocers. According to Mr. Katsadouros, the lack of credit tenants, coupled with the fact that this Debtor is in bankruptcy and its principals are not currently creditworthy, makes traditional loans unavailable to the Debtor.

The only option left for the Debtor, in Mr. Katsadouros' opinion, would be a commercial mortgage-backed security loan (CMBS). With respect to CMBS loans, Mr. Katsadouros references the Trepp Report, which reflects interest rates being charged for various kinds of loans, as a type of report that is regularly relied on in his industry to determine interest rates in actual transactions. According to the Trepp Report that Mr. Katsadouros relied on, there were seven loans to retail borrowers in the Tampa area in 2013. The interest rates for those loans averaged approximately 4%. But Mr. Katsadouros did not believe that the Debtor would be able to get a CMBS loan because this Debtor is still too small and "unanchored," not to mention the pricing and expense involved.

The Court finds Mr. Katsadouros' testimony that no efficient market exists for exit financing here more credible—and more persuasive—than Mr. Repka's testimony. Based on Mr. Katsadouros' testimony, the Court concludes that no efficient market exists. And given that no efficient market exists, it is appropriate to follow the formula approached enunciated in *Till*. Under that formula approach, the Court will start with the prime rate and add an appropriate supplemental risk adjustment. Mr. Katsadouros testified credibly that a 1.75% risk adjustment was appropriate under the facts of this case—for a total interest rate of 5%.

The Court agrees. Based on the Debtor's payment history (this is not a payment-default case), the substantial loan-to-value ratio, the many years of experience Mr. Householder has managing the property, and a pro forma that is based upon current rental numbers and expenses, the Court finds that the adjustment of 1.75% for risk is appropriate under the circumstances. Accordingly, 5% is an appropriate cramdown interest rate.

<u>The plan satisfies the best interest of the creditors test</u>.

SPCP argues that the Debtor's plan fails the best interest of the creditors test because it is in SPCP's best interest to simply get its collateral back and move on. Of course, that is not the

standard for determining whether the Debtor satisfies the best interest of the creditors test codified in § 1129(a)(7)(A)(ii). That section only requires that creditors receive at least as much under the plan as they would receive in a chapter 7 liquidation. A creditor obviously cannot do better than being paid in full, with interest. And it would be contrary to everyone's interest if additional fees and costs were incurred if this case was converted and a trustee was involved incurring yet additional administrative costs. Accordingly, the Court finds the Debtor satisfies the best interest of the creditors test.

<u>The proposed bar order is appropriate under the facts of this case</u>.

The Debtor's plan includes a bar order enjoining SPCP from pursuing its claims against the Householders under personal guaranties so long as the Debtor is current on its plan payments. Whether the proposed bar order is permissible in a particular case hinges on the Court's interpretation of two bankruptcy code sections: §§ 105 and 524(e).[53] Section 105, of course, grants bankruptcy courts broad discretion to enter any order, process, or judgment that is necessary to carry out the provisions of the Bankruptcy Code. There is no question that § 105 authorizes bankruptcy courts to bar actions against non-debtor third parties.[54]

The Eleventh Circuit has repeatedly recognized as much in *In re Munford*[55]and, more recently, *In re Superior Homes & Investments, LLC*.[56] And this Court recognized the same thing in two recent cases: *In re GunnAllen Financial*[57] and *In re Fundamental Long Term Care*.[58] All

---

[53] *In re Transit Group, Inc.*, 286 B.R. 811, 815 (Bankr. M.D. Fla. 2002).

[54] *Munford v. Munford, Inc. (In re Munford)*, 97 F.3d 449, 454-55 (11th Cir. 1996); *Apps v. Morrison (In re Superior Homes & Invs., LLC)*, 2013 WL 2477057, at *2–3 (11th Cir. Jun. 10, 2013).

[55] *In re Munford*, 97 F.3d at 454-55.

[56] *In re Superior Homes & Invs., LLC*, 2013 WL 2477057, at *2–3.

[57] *In re GunnAllen Fin., Inc.*, 443 B.R. 908, 915 (Bankr. M.D. Fla. 2011).

of those cases, however, dealt with bar orders as part of a motion to compromise. None of those cases dealt with whether a court could approve a bar order (or third-party injunction) as part of a confirmed plan.

That is where § 524(e) comes in: § 524(e) provides that the discharge of a debt of the debtor under § 1141 ordinarily does not affect the liability of any other party for that same debt. So the discharge of the Debtor in this case would not extinguish any of the non-debtor guarantors' liability to SPCP. Since § 105 cannot be used to grant relief inconsistent with another code section, the question arises whether § 524(e) conflicts with § 105 and, as a consequence, precludes a bankruptcy court from confirming a plan that includes an injunction barring actions against non-debtor guarantors.

This Court entered such an injunction in *Safety Harbor*.[59] There, the Court's power to enter certain conditions on the injunction was challenged on the basis of jurisdiction in light of the Supreme Court's recent decision in *Stern v. Marshall*.[60] The Court ruled that it did have jurisdiction.[61] A much more important case in this area is Judge Jennemann's decision in *In re Transit Group*.[62]

As Judge Jennemann discussed in *In re Transit Group*, the Second, Third, Fourth, Sixth, Seventh, and Eighth Circuits have all held that injunctions (or non-debtor releases) in confirmed plans are permissible under § 105.[63] Those courts have reasoned that §§ 105 and 524 do not

---

[58] *In re Fundamental Long Term Care, Inc.*, 492 B.R. 571, 577 (Bankr. M.D. Fla. 2013).

[59] *In re Safety Harbor Resort & Spa*, 456 B.R. 703, 719 (Bankr. M.D. Fla. 2011).

[60] *Id.* at 707-18 (analyzing *Stern v. Marshall*, 131 S. Ct. 2594 (2011)).

[61] *Id.*

[62] 286 B.R. 811 (Bankr. M.D. Fla. 2002).

[63] *Id.* at 816.

conflict since nothing in § 524 specifically precludes a court from entering a bar order. Section 524 simply provides that—assuming the plan does not provide otherwise—the discharge under § 541 does not affect a creditor's claim against a non-debtor. The Eleventh Circuit has not specifically addressed this issue in the context of confirmation, although it has approved bar orders in other contexts.

And bankruptcy courts in this district have approved bar orders (or non-debtor releases) in connection with confirmation. Judge Paskay, for instance, in *Shaw Aero Devices*, approved a bar order in a confirmed plan that prohibited a creditor from pursuing claims against the debtor's president (a non-debtor guarantor on the loan to the debtor) so long as the payments under the plan were current since the debtor's president was instrumental in the debtor's success. Likewise, Judge Jennemann, in a well-reasoned decision, approved non-debtor releases in *Transit Group* discussed above. The decisions by Judge Paskay and Judge Jennemann both look to the factors articulated by the other circuits approving injunctions.

Those factors—which are nonexclusive—include whether: (1) the debtor and the third party share an identity of interest, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (2) the non-debtor has contributed substantial assets to the reorganization; (3) the injunction is essential to reorganization, namely, the reorganization hinges on the debtor being free from indirect suits against parties who would have indemnity or contribution claims against the debtor; (4) the impacted class, or classes, has overwhelmingly voted to accept the plan; (5) the plan provides a mechanism to pay for all, or substantially all, of the class, or classes, affected by the injunction;

and (6) the plan provides an opportunity for those claimants who choose not to settle to recover in full.[64] Here, all of those factors weigh in favor of approving the bar order.

To begin with, there is an identity of interest here since the Householders (along with their children) own 100% of the partnership that is the beneficiary of the trust (the Debtor) that owns the subject property. As Mr. Householder testified, this is their retirement and sole means of livelihood. They have owned this shopping center and surrounding property for decades. A lawsuit against the guarantors in this case would completely thwart the reorganization efforts of the debtor. Inevitably, the Householders would end up in individual Chapter 11 cases if the bar order is not approved, which would result in the needless expenditure of more funds to confirm their cases, although there would be a high probability their (potential Chapter 11) cases would be confirmed since SPCP is being paid in full in this case.

This is the same thing that happened in *Cypress Creek*. After confirmation of the plan in that case, SPCP continued to pursue the five family members on the guaranties. So they all had to go through individual Chapter 11 cases, resulting in this Court presiding over five additional Chapter 11 cases. The Court confirmed those cases over the objection of SPCP based on the payments that were being made out of the corporate case. SPCP appealed that decision and Judge Bucklew affirmed that decision.[65] But it took a lot of money to get there and nothing was really accomplished by the process. An injunction here will stop that needless expenditure of time and effort and allow the Debtor to continue to reorganize and the guarantors to improve their credit rating. Obviously, being forced into bankruptcy would not help the credit rating at all. In fact, it

---

[64] *Id.* at 817 (citing *In re Dow Corning Corp.*, 280 F.3d 648 (6th Cir. 2002); *In re Cont'l Airlines*, 203 F.3d 203 (3d Cir. 2000); *In re Specialty Equip. Co., Inc.*, 3 F.3d 1043 (7th Cir. 1993); *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285 (2d Cir.1992); *In re A.H. Robins Co., Inc.*, 880 F.2d 694 (4th Cir.1989)).

[65] *SPCP Group, LLC v. Biggins*, 465 B.R. 316 (M.D. Fla. 2011).

would be detrimental to the Debtor's ability to refinance in five years. So the bar order is absolutely necessary for feasibility in this case. Importantly, the injunction is not a release or discharge of the debt; it simply prevents the state law action from being filed while the Debtor is current on its payments under the confirmed plan.

Moreover, the Householders have, through the depletion of their personal assets, significantly contributed to the Debtor's assets. And they will be contributing the time and effort managing the property going forward, including rehabilitating their own personal financial circumstances so that the Debtor can be in a position to refinance the SPCP loan in five years. If SPCP can go against the guarantors in this case, and seize control of the corporation, all of the reorganization efforts would be wasted. And again, it is crucial to paying off the loan in five years for the individual guarantors to be free to rehabilitate their credit without having to go through their own personal bankruptcy. All that would do would be to delay the time that they can improve their credit and hamper the ability of the Debtor to refinance.

In addition, despite SPCP's attempt to take control of the case by buying up claims, the creditors nevertheless voted in support of the plan. Even BB&T changed its vote at the last minute to go along with the Debtor's reorganization efforts. And all of the classes of creditors will be paid 100%. In fact, there are no creditors who will not be paid in full in this case.

Finally, SPCP will not be harmed by the proposed bar order. A guarantee of secured debt typically is intended to protect a lender from any deficiency. But there will not be any deficiency here. If SPCP is free to go against the Householders, however, then the Debtor will be irreparably injured by virtue of its inability to refinance in five years. Given all of that, the Court finds that the proposed bar order is appropriate, subject to one very important limitation: if there is a default by the Debtor under the plan or confirmation order, then SPCP may proceed against

the Householders. In essence, SPCP is retaining the full benefit of its bargain by having the

Householders available to pay the full amount of its claim, plus interest, if there is a default by

the Debtor as the primary obligor.

### Conclusion

In order to confirm its plan, the Debtor must satisfy all of the elements set forth in

§ 1129(a). The Debtor in this case has proven those elements by a preponderance of the

evidence. Specifically, the Court finds the plan is feasible; that it was proposed in good faith; that

5% is the appropriate cramdown interest rate; that the plan satisfies the best interests of the

creditors; and that the bar order enjoining SPCP from pursuing its claims against the

Householders on their personal guaranties is appropriate. Accordingly, the Court will enter a

separate order overruling SPCP's confirmation objection, approving the Debtor's disclosure

statement, and confirming the Debtor's plan.

**DATED** in Chambers at Tampa, Florida, on __October 23, 2013_____.

_____
Michael G. Williamson
United States Bankruptcy Judge

**Adam Lawton Alpert, Esq.**
**Buss Ross, P.A.**
*Counsel for Debtor*

**Gregg W. McClosky, Esq.**
**McClosky, D'Anna & Dieterle, LLP**
*Counsel for SPCP Group V, LLC*

Service Instructions: Adam Lawton Alpert is directed to serve a copy of this memorandum
opinion on interested parties and file a proof of service within 3 days of entry of the opinion.