UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:                                                    Case No. 8:13-bk-07271-MGW
                                                          Chapter 11
J.C. Householder Land Trust #1,

        Debtor.
_____/

### MEMORANDUM OPINION ON CREDITOR'S
### MOTION TO CHANGE VOTE ON PURCHASED CLAIM

Under Federal Rule of Bankruptcy Procedure 3018(a), the Court may permit a creditor to

change a ballot accepting or rejecting a plan for "cause shown." In this case, the Debtor filed a

plan of reorganization that attempted to cram down its major secured creditor, SPCP Group V,

LLC, under Bankruptcy Code § 1129(b). So SPCP purchased an unsecured claim that had

previously voted in favor of the plan and attempted to change that vote to one against the plan in

order to block confirmation. SPCP's motivation to block confirmation, however, does not

constitute sufficient "cause" under Rule 3018. Accordingly, the Court will deny SPCP's motion

to change the vote of the unsecured claim it purchased.

### Background[1]

The Debtor owns 7.13 acres of land in Plant City, Florida, consisting of a 30,420 square-

foot multi-tenant retail shopping complex, a small commercial office building, and a rental

home.[2] The Debtor originally financed the purchase of that property through Bank of America.

AmSouth Bank acquired the loan from Bank of America and later sold it to SPCP. The loan now

held by SPCP, which is secured by the Debtor's property, matured in June 2012.

---

[1] A more complete background of this case can be found in the Court's Findings of Fact and Conclusions of Law on Confirmation. *In re J.C. Householder Land Trust #1*, 501 B.R. 441, 444-47 (Bankr. M.D. Fla. 2013).

[2] Doc. No. 9 at 1–2.

Despite its best efforts, the Debtor was unable to refinance the SPCP loan when it became due. So SPCP sued to foreclose its mortgage on the property. At the time, the Debtor had nearly $800,000 in equity in the property (the debt owed to SPCP totaled approximately $1 million, while the property securing the debt was worth about $1.8 million). Hoping to preserve its $800,000 of equity in the property, the Debtor filed this chapter 11 case.[3]

At the time it filed this case, the Debtor only had two unsecured creditors: Tampa Electric Company held a $32,254.52 unsecured claim, and Tom Murtha (the Debtor's accountant) held a $3,200 unsecured claim. The Debtor also had three secured creditors: SPCP (which was owed just over $1 million), the Hillsborough County Tax Collector (in an unknown amount), and BB&T (which was owed about $18,755.26). When the Debtor filed its plan, each of its three secured creditors were classified separately (Classes 2, 3 & 4), while the two unsecured creditors were classified together (Class 5).[4]

Two of the three secured creditors—SPCP and BB&T—voted to reject the plan.[5] The third secured creditor—the Hillsborough County Tax Collector—did not vote because its claim was unimpaired.[6] As for the unsecured claims, Tampa Electric did not timely file a ballot.[7]

---

[3] *Id.* at 3-4.

[4] Doc. Nos. 13 & 70. The Debtor's plan actually had a total of six classes. Class 1 consisted of allowed priority claims; Class 6 consisted of the equity interests in the Debtor.

[5] Doc. No. 69 at 1.

[6] *Id.*

[7] Tampa Electric eventually filed a ballot accepting the plan—albeit after the ballot deadline. The Debtor moved to allow Tampa Electric's late-filed ballot. Doc. No. 88. That motion was granted at the confirmation hearing.

Murtha, the only other unsecured creditor, voted in favor of the plan.[8] So Class 5 accepted the

plan based solely on the vote of Murtha's $3,200 claim.[9]

And once the Debtor had one impaired class voting in favor of the plan, it sought to cram

down SPCP's secured claim. SPCP, naturally, opposed cramdown. In order to block

confirmation, SPCP acquired Murtha's unsecured claim one week before the confirmation

hearing. SPCP then sought leave of court to change Murtha's ballot from a vote in favor of the

plan to one against it.[10] According to SPCP, once it acquired Murtha's claim, Murtha no longer

had an interest in the claim. For that reason alone, SPCP said it should be able to decide how the

claim was voted. Plus, SPCP said it would be unfair if Murtha's claim—which only made up

10% of the unsecured class—had the effect of carrying the entire class. The Debtor objected that

SPCP had failed to demonstrate the "cause" required to change its vote under Rule 3018.[11]

The Debtor cited two cases—*In re Kellogg Square Partnership* and *In re Windmill*

*Durango Office, LLC*—for the proposition that "cause" for changing a vote under Rule 3018

does not exist when the purpose of changing the vote is to block confirmation.[12] In both *Kellogg*

*Square* and *Windmill Durango*, the courts—in denying motions to change ballots—held that the

proper test for "cause" is whether the creditor's decision is "tainted" by an "improper

motivation."[13] While this Court agrees with the outcome in *Kellogg Square* and *Windmill*

---

[8] Doc. No. 69 at 1 & 5.

[9] 11 U.S.C. § 1126(c).

[10] Doc. No. 83.

[11] Doc. No. 85.

[12] *Id.* at 2-4 (citing *In re Kellogg Square P'ship*, 160 B.R. 332, 333-35 (Bankr. D. Minn. 1993) and *In re Windmill Durango Office, LLC*, 481 B.R. 51, 65-66 (BAP 9th Cir. 2012)).

[13] *Kellogg Square*, 160 B.R. at 334; *Windmill Durango Office,* 481 B.R. at 65-66.

*Durango*, it is not comfortable resting its ruling in this case entirely on the reasoning in those decisions for two reasons.

First, the *Kellogg Square* and *Windmill Durango* courts both based their decisions, in part, on the law of assignments:

> Where an entity acquires a creditor's claim *after* the creditor has already case a vote on a plan of reorganization, the assignor-creditor's evidenced commitment to that specific participation in the case is a permanent, binding limitation on the transferred claim.[14]

But that statement of the law of assignments does not resolve the question this Court faces (or the one the court faced in *Kellogg Square*) since an entity that acquires another creditor's claim would be entitled to change the previously filed ballot if it can demonstrate cause, just the same as the original creditor would be able to if it could make the required showing.

Second, the Court has some concern regarding the basis for the test employed by the *Kellogg Square* and *Windmill Durango* courts. It appears, based on this Court's review of those decisions, that the test employed by those courts originated from *Collier on Bankruptcy*—a widely respected bankruptcy treatise that is often viewed as persuasive authority. The problem is that the test in *Collier on Bankruptcy* is derived from three cases construing a slightly different version of Rule 3018.[15]

The original version of Rule 3018 imposed two requirements: (i) like the current version of Rule 3018, a creditor was required to demonstrate cause in order to change its vote; and (ii) unlike the current version of the rule, the original version required the creditor to file any motion

---

[14] *Kellogg Square*, 160 B.R. at 335 (emphasis in original).

[15] *In re E. Sys., Inc.*, 118 B.R. 223, 226 (Bankr. S.D.N.Y. 1990) (observing that *Collier* based its "tainted" language on three cases: *Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1163 (5th Cir. 1988); *In re Jartran, Inc.*, 44 B.R. 331, 363 (Bankr. N.D. Ill. 1984); *In re Am. Solar King Corp.*, 90 B.R. 808, 827 (Bankr. W.D. Tex. 1988)).

to change a vote before the ballot deadline expired. Courts construing the original Rule 3018 applied the "tainted by improper motivation" test for determining cause if the motion was filed before the ballot deadline and an "exceptional circumstances" test if it was filed after the deadline.[16] Given the uncertainty regarding the test employed by the *Kellogg Square* and *Windmill Durango* courts, it is important for this Court to conduct its own examination of the text of Rule 3018 and, more specifically, the meaning of the term "cause."

### Conclusions of Law[17]

The term "cause" is the central focus of this Court's inquiry because, as explained above, the plain language of Rule 3018 requires a creditor to demonstrate "cause" before it is allowed to change a vote in favor of or against a plan: "For cause shown, the court after notice and hearing may permit a creditor or equity security holder to change or withdraw an acceptance or rejection" of a proposed plan of reorganization.[18] The problem, however, is that Rule 3018 does not define what constitutes "cause."[19] Ordinarily, where the bankruptcy rules fail to define a term, the Court looks to the Bankruptcy Code to determine its meaning.[20] But the Bankruptcy Code, like Rule 3018, does not define cause either.[21]

---

[16] *In re E. Sys., Inc.*, 118 B.R. at 226.

[17] The Court has jurisdiction over this proceeding under 28 U.S.C. § 1334(a). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (L), and (O).

[18] Fed. R. Bankr. P. 3018(a).

[19] *Id.*

[20] *Schwab v. Reilly*, 560 U.S. 770 ("[W]e may look to dictionaries and the Bankruptcy Rules to determine the meaning of words the Code does not define."); *In re Ralston*, 400 B.R. 854, 860 (Bankr. M.D. Fla. 2009) (explaining that courts should look to a term's ordinary, dictionary-defined meaning where the term is undefined in the Bankruptcy Code) (citing *Consol. Bank, N.A. v. U.S. Dep't of the Treasury*, 118 F.3d 1461, 1464 (11th Cir. 1997)).

[21] *In re Brown*, 290 B.R. 415, 423 (Bankr. M.D. Fla. 2003) (explaining that "cause" is not defined in the Bankruptcy Code).

Instead, the Code provides examples of what constitutes cause.[22] For example, § 707(a) provides that unreasonable delay by a debtor that is prejudicial to creditors, nonpayment of fees, and the failure to file information requested by § 521 all constitute "cause" for dismissing a chapter 7 case.[23] Similarly, § 1112 provides sixteen examples of "cause" for converting or dismissing a chapter 11 case.[24] The examples of "cause" set forth in the Bankruptcy Code, however, are not helpful here because those examples deal with what is akin to "bad cause."[25]

"Cause" under Rule 3018, by contrast, is more akin to "good cause." The Bankruptcy Code does contain instances where "cause" is used in the sense of "good cause."[26] Unfortunately, in those instances, the Bankruptcy Code does not—unlike instances where "cause" is understood to mean "bad cause"—provide any examples. Since the Bankruptcy Code does not provide any guidance on what constitutes "good cause," the Court turns to the dictionary.[27] Black's Law Dictionary defines the term "cause" to mean a "ground for legal action."[28] "Good cause," according to Black's Law Dictionary, means a "legally sufficient reason."[29]

Legally sufficient, of course, must be determined in context. The only way to determine whether "cause" is legally sufficient under a Federal Rule of Bankruptcy Procedure in the

---

[22] 11 U.S.C. §§ 707(a), 1104(a)(1), 1112(b)(4) & 1307(c).

[23] 11 U.S.C. § 707(a).

[24] 11 U.S.C. § 1112(b)(4).

[25] 11 U.S.C. §§ 707(a), 1104(a)(1), 1112(b)(4) & 1307(c).

[26] See, e.g., 11 U.S.C. § 303(e) (providing that court may, for cause, require petitioning creditors to post bond in involuntary case); § 521(a)(2)(A) (providing that court may extend time to file statement of intentions for cause), § 1121(d)(1) (providing that bankruptcy courts may, after notice and a hearing, modify the exclusivity period for "cause").

[27] *In re Rodriguez*, 319 B.R. 894, 897 (Bankr. M.D. Fla. 2005) (applying the plain everyday dictionary meaning of the term "nonprofit institution" since that term is not defined in the Bankruptcy Code).

[28] Black's Law Dictionary 213 (7th ed. 1999).

[29] *Id.*

context of a chapter 11 case is to look to the public policy underlying chapter 11 cases. The two

public policies specifically underlying Chapter 11 are "preserving going concerns and

maximizing property available to satisfy creditors."[30] In order to promote both those policies, the

bankruptcy process encourages consensual negotiation and fair bargaining.[31] So, here, the Court

must determine whether allowing a creditor to buy an already-voted claim and change the vote to

block confirmation promotes consensual negotiation and fair bargaining.

The Court concludes that it does not. In order to promote consensual negotiating and fair

bargaining, the Code attempts to balance the powers and limitations of debtors and creditors

alike. For instance, the Bankruptcy Code grants debtors the sole right to file a proposed plan

during the first 120 days of the case.[32] A party-in-interest—such as a secured creditor—may not

file a plan unless (i) a trustee has been appointed; (ii) the debtor has not filed a plan during the

120-day "exclusivity" period; or (iii) the debtor has filed a plan but it has not been accepted

within 180 days of the order for relief.[33] And the voting requirements for confirming a plan

ensure that a debtor engages in good-faith negotiations with its creditors to achieve at least a

rough consensus on the terms for repaying its debts. Allowing one creditor to acquire another

creditor's claim and change that claim's vote to block confirmation destroys the carefully

constructed balance between debtor and creditors in the confirmation process.[34]

---

[30] *Florida Dep't of Revenue v. Piccadilly Cafeterias, Inc.*, 554 U.S. 33, 50 (2008); *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999).

[31] *In re Fur Creations by Varriale, Ltd.*, 188 B.R. 754, 758 (Bankr. S.D.N.Y. 1995) (quoting *In re 500 Fifth Ave. Assocs.*, 148 B.R. 1010, 1017 (Bankr. S.D.N.Y. 1993)); *see also Am. United Mut. Life Ins. Co. v. Avon Park*, 311 U.S. 138, 146 (1940); *In re Am. Family Enters.*, 256 B.R. 377, 501 (D. N.J. 2000) (quoting *In re New Valley Corp.*, 168 B.R. 73, 81 (Bankr. D. N.J. 1994)); H.R. Rep. No. 95-595, at 221 (1977).

[32] 11 U.S.C. § 1121(b) (providing that "only the debtor may file a plan until after 120 after the date of the order for relief").

[33] 11 U.S.C. § 1121(c)(1)-(3).

[34] *In re OBT Partners*, 214 B.R. 863, 870 (Bankr. N.D. Ill. 1997).

In fact, it would sharply shift that balance toward the creditor that has attained a blocking position.[35] Other creditors will be forced into the untenable position of either complying with the blocking creditor's demands or facing diminution of their interests. That encourages side deals that lead to plans that unfairly treat other creditors, as well as the debtor. Creditors will be "'left to select not the best plan of reorganization but the best deal they might be able to individually negotiate,' with major constituencies vying for control of the case behind the scene of the confirmation process."[36]

Instead of a plan resulting from the consultation between a debtor and the body of creditors, the blocking creditor alone can now dictate the terms of any potential reorganization.[37] Any plan that emerges out of that unequal bargaining position will likely favor the creditor's short-term return at the expense of the debtor's long-term viability.[38] A debtor's long-term viability, of course, is one of the fundamental policies underlying the reorganization process.[39] To be sure, a debtor could overcome the blocking creditor by treating that creditor's class as unimpaired or paying the class its absolute priority entitlement.

By limiting a debtor to those two options, however, the blocking creditor has already managed to successfully divert significant value to itself or its class in a manner never

---

[35] *Id.*

[36] *In re Kellogg Square P'ship*, 160 B.R. 332, 335 (Bankr. D. Minn. 1993) (quoting *In re Applegate Prop., Ltd.*, 133 B.R. 827, 836 (Bankr. W.D. Tex. 1991)).

[37] David A. Skeel, Jr., *The Nature and Effect of Corporate Voting in Chapter 11 Reorganization Cases*, 78 Va. L. Rev. 461, 479–80 (1992).

[38] Frederick Tung, *Confirmation and Claims Trading*, 90 Nw. U. L. Rev. 1684, 1729 (1996).

[39] *In re Dow Corning Corp.*, 244 B.R. 673, 677 (Bankr. E.D. Mich. 1999) (contending that "the result envisioned by the drafters of chapter 11" is that a debtor "emerge from bankruptcy as a viable corporation"); *In re Piece Goods Shops Co.*, 188 B.R. 778, 790 (Bankr. M.D.N.C. 1995) (stating that the goal of Chapter 11 is a plan that provides "the means through which the Debtors may continue to operate as a viable entity in the marketplace"); *In re Madison Hotel Assocs.*, 749 F.2d 410, 420 (5th Cir. 1984) (quoting H.R. Rep. No. 95-595, at 220 (1977) (explaining that Chapter 11, by allowing a business to "extend or reduce its debts," returns that entity "to a viable state")).

envisioned by the Bankruptcy Code. [40] And as a consequence, the claims of other classes of creditors will be altered to their detriment. In the end, allowing a creditor to acquire a claim that had previously voted and change the previously filed vote to block confirmation not only creates a huge risk of opportunistic behavior but encourages behavior that is inconsistent with consensual negotiation and fair bargaining. [41]

On top of that, it would negatively impact the otherwise orderly reorganization process. For starters, certain creditors will realize that no vote is final or definitive. And last-minute vote changing (to suit one creditor's interest) would invariably throw into doubt previous negotiations and arrangements between the debtor and its other creditors, creating the kind of chaos that Chapter 11's procedures were designed to avoid. Perhaps worse, investments in time and money so critical to the successful rehabilitation of a debtor will have been squandered, and prior negotiations and accommodations among a debtor and other creditors will be undone. No creditor could ever be confident in investing either their time or money in any debtor-proposed plan so long as a blocking creditor might eventually arise. Other creditors, moreover, might decide to change their ballots for strategic reasons to gain leverage in what would be never-ending negotiations. [42] All of this leads to one unmistakable conclusion: changing a vote to block confirmation cannot constitute cause under Rule 3018.

This conclusion is buttressed by the cases allowing a creditor to change a previously cast vote. In some cases, courts have allowed a creditor to change a ballot where some defect—i.e., a breakdown in communications at the voting entity, misreading the terms of the plan, or execution

---

[40] Tung, *Confirmation and Claims Trading*, *supra* note 38, at 1728.

[41] Skeel, *Nature and Effect of Corporate Voting in Chapter 11*, *supra* note 37, at 479-80.

[42] *In re Dow Corning Corp.*, 237 B.R. at 378.

of the ballot by someone without authority—resulted in the original ballot not intelligently

expressing the will of the creditor at the time the ballot was cast.[43] In other cases, courts have

allowed creditors to change a previously filed ballot where other creditors would not be

prejudiced by the change. For instance, courts have found "cause" existed where (i) due to the

brevity of the voting period and the intricacy of the amended plan, it was necessary for creditors

to reevaluate their votes, and the only injury complained of from the changed vote was entirely

speculative;[44] (ii) the debtor had drafted a new plan that offered a higher return than under the

original plan;[45] and, (iii) the debtor and creditor seeking to change its vote had negotiated and

agreed upon a new "consensual plan."[46] A single thread runs throughout these cases: the change

in vote advanced the objectives of Chapter 11—i.e., promoting consensual negotiation and fair

bargaining in order to preserve going concerns and maximize property available to satisfy

creditors.

### Conclusion

In the end, the reason for changing a vote is legally sufficient under Rule 3018 if it

promotes consensual negotiation and fair bargaining. Changing a previously cast ballot to block

confirmation does not promote consensual negotiation or fair bargaining. In fact, it does the

opposite. Here, SPCP's sole purpose in changing Murtha's vote was to block confirmation and

cramdown of its secured claim. Accordingly, SPCP has failed to demonstrate the "cause"

---

[43] *In re Kellogg Square P'ship*, 160 B.R. at 334 (citing 8 *Collier on Bankruptcy* ¶ 3018.03); *see also, In re MCorp Fin., Inc.*, 137 B.R. 237, 238 (Bankr. S.D. Tex. 1992); *In re Houser Shoes, Inc.*, 245 B.R. 486, 490 (citing *Kellogg Square*, 160 B.R. at 334 and *In re Piece Goods Shops Co.*, 188 B.R. 778 (Bankr. M.D.N.C. 1995)).

[44] *In re Epic Assocs. V*, 62 B.R. 918, 924, 926 (Bankr. E.D. Va. 1986).

[45] *In re Eddington Thread Mfg. Co.*, 189 B.R. 898, 900 n.5 (E.D. Pa. 1995).

[46] *In re CGE Shattuck LLC*, 2000 WL 33679416, at *3 (Bankr. D.N.H. Nov. 28, 2000); *In re Cajun Elec. Power Coop.*, 230 B.R. 715, 744 (Bankr. M.D. La. 1999); *In re Am. Solar King Corp.*, 90 B.R. 808, 825 & n.33 (Bankr. W.D. Tex. 1988).

required to change Murtha's vote under Rule 3018, and this Court will enter a separate order

denying SPCP's motion.

**DATED** in Chambers at Tampa, Florida, on ___ December 30, 2013 _____.

_____

Michael G. Williamson
United States Bankruptcy Judge

**Adam Lawton Alpert, Esq.**
**Bush Ross, P.A.**
*Counsel for Debtor*

**Gregg W. McClosky, Esq.**
**McClosky, D'Anna & Dieterle, LLP**
*Counsel for SPCP Group V, LLC*

Attorney Adam Lawton Alpert is directed to serve a copy of this memorandum opinion on interested parties and file a proof of service within 3 days of entry of the opinion.